GLADNEY, Judge.
This action for personal injuries and property damage was filed by Archie T. Rhea and his wife, Katherine Hill Rhea, as a result of a collision between their 1949 Plymouth sedan and a 1950 Chevrolet truck owned by Allen and Alfred Farrington, and driven by their employee, Lonnie Williams. Travelers Indemnity Company, insurer of the Farrington truck, and the Farringtons are made defendants. After trial on the merits, judgment was rendered against the Travelers Indemnity Company and in favor of Archie T. Rhea for the sum of $5,950, and in favor of Mrs. Katherine Hill Rhea for $5,000. Plaintiffs’ demands against Allen Farrington and Alfred Farrington were rejected. From the judgment so rendered, the Travelers Indemnity Company *48 has perfected suspensive and devolutive appeals and plaintiffs have perfected a devolu-. tive appeal.
It is alleged on the 25th of July, 1952, at about 6:30 o’clock p. m., petitioners were riding in the front seat of their 1949 Plymouth sedan driven by Archie T. Rhea proceeding easterly along Louisiana Highway 12-1345, commonly known as the Springhill-Shongaloo Highway; that their automobile was being operated properly and at a safe rate of speed when Lonnie Williams, an employee of Allen Farrington and Alfred Farrington, drove his employer’s truck into petitioners’ lane of traffic and a collision between the two vehicles resulted; that the accident was caused solely by the negligence of Lonnie Williams: in failing to operate the truck in such a manner as to be able to stop within the range of his vision; in driving at an improper speed under existing weather conditions; in failing to maintain a proper lookout; in losing control of the said motor truck; in driving the truck on the wrong or left side of the highway; in failing to promptly act to avert a collision when the same became apparent to him; and in untimely and improperly applying the brakes of said truck.
The insurer first appeared and filed exceptions of no cause and no right of action directed at provisions of the petition alleging the insurer should be subjected to penalties and attorneys’ fees for failing to make payment of their claims. The defendants, Farringtons, filed an exception of no cause or right of action predicated on the contention Lonnie Williams was not acting within the scope of his employment at the time of the accident. These exceptions were properly referred to the merits. In their answers all defendants denied any act of negligence by Lonnie Williams and aver the proximate cause of the accident was the negligence of Archie T. Rhea in driving the Plymouth automobile at an excessive and unlawful rate of speed under existing weather conditions and in failing to drive in his proper lane of traffic. A plea of contributory negligence is interposed, based on the alleged negligence of Archie T. Rhea as above set forth and also upon the averment that Mrs. Rhea failed to warn her husband to reduce his speed and drive on his side of the highway. An additional defense is urged in that plaintiff, Archie T. Rhea, had the last clear chance to avoid the accident and failed to do so. By way of supplemental answer, defendants have set forth a further charge of negligence on the part of Archie T. Rhea in that it was alleged that at the time of the accident Archie T. Rhea did not have his lights turned on.
As a result of severe head injuries when the case was tried, Archie T. Rhea testified he was unable to recall any of the events immediately preceding and immediately following the accident. Medical evidence shows Rhea was unconscious for at least ten days following the collision. Rhea did, unquestionably suffer from a form of amnesia which prevented him from recalling circumstances relevant to the cause of the collision. Lonnie Williams, the other driver, did not testify upon the trial of the case. According to the record, Williams disappeared and was not located prior to trial. However, depositions of Williams were taken by counsel for the plaintiffs shortly after the suit was filed and this much of his testimony has been preserved. In addition to the deposition of Williams so taken, counsel for both sides have agreed upon certain stipulated facts which Williams would have testified to had he been present at the trial of the case. In addition to the two drivers involved, the only other eye witnesses to the actual collision were Mrs. Katherine Hill Rhea, Charlie Grimit and Ellen Nelson. Shortly following the collision Lt. Bert G. Braley, of the State Police Department appeared upon the scene and his observations and findings are pertinent. Other evidence in the record relates to other factors involved in the case such as the question of deviation by Williams from the scope of his employment and the quantum of damages.
The accident occurred approximately two or three miles east of Springhill. All witnesses stated the weather was extremely bad and at the time of the accident it was raining hard and almost dark. The eighteen foot blacktop highway was wet and slippery. *49 Photographs and testimony disclose the Rhea automobile entered a sharp curve just prior to reaching a bridge approximately twenty feet wide and about the same in length. The apex of this curve is about 3S0 feet from the bridge. The accident occurred about twenty feet east of the east end of the bridge. There is a hill east of the bridge and a vehicle in proceeding west goes down the hill and a distance of 650 feet before reaching the bridge. Despite the poor atmospheric conditions prevailing we think the occupants of either vehicle should have seen the lights of the other vehicle from a distance of 500 feet or more.
Mrs. Rhea testified: that she observed the truck coming over the hill at an excessive rate of speed, of greater than forty miles per hour; that the vehicle was being driven partially on the wrong side of the road and the driver thereof did not substantially reduce his speed until he applied his brakes momentarily before the collision. She testified that her husband was driving at from fifteen to twenty miles per hour in his right lane of the road with his lights turned on dim. She also testified that her husband did not have time to apply his brakes and that she screamed just prior to the collision.
Lt. Braley of the Louisiana State Police Department testified that when he arrived at the scene of the accident he found the Rhea automobile far over to the south side of the road and the truck was sitting across the road at an angle to the east of the bridge, the front end of the truck resting near the center of the road and the rear being entirely off the north side of the highway. He testified that from the physical facts found the accident occurred on the south lane or in the proper side for the Rhea automobile to travel. He observed a tire mark on the north edge of the highway which he decided was made by the right rear wheel of the truck and was suggestive that the back end of the truck was skidding somewhat to the side when this mark was made. Lt. B.raley also inferred solely from the amount of damage inflicted upon the two vehicles that the Rhea car was traveling at a speed of approximately fifty miles per hour at the time of the collision.
The testimony of Lonnie Williams, Charlie Grimit and Ellen Nelson is persuasive that none of these individuals saw plaintiffs' automobile until almost at the instant of the collision. Lonnie Williams testified:
“When I got where I could see the bridge, me and him was both in the bridge.”
Charlie Grimit declared:
“We was mighty near to the bridge and so the car was cornin’ in and I couldn’t see very fur, but I could see it bettern’n Lonnie.”
In referring to the Rhea automobile, he said:
“And so he was ’way over, too far, and we couldn’t pass him without hittin’ him. * * * so I told Lonnie to ‘hold ’er’, by it bein’ rainin’, and he throwed on his brake and that just slides into Mr. Rhea.”
Grimit testified that Lonnie was driving at approximately twenty-five miles per hour. Continuing, he said that after he told Lonnie to “hold ’er”:
“He got on his brakes, and by hit bein’ slick cornin’ down that hill there, that just slided in — hit the front of Mr. Rhea’s car; ’cause we couldn’t stop at the time, it was so close together.”
Ellen Nelson testified when Lonnie put on his brakes she did not know which way the truck skidded. This witness was not examined very closely by counsel and it is apparent she was not very observant just before the collision.
It is significant none of the eye witnesses who testified at the trial would estimate the distance from which the other vehicle was first observed. Mrs. Rhea declined to fix the distance from the truck when she first observed its lights. The testimony of Williams, Grimit and Nelson show they did not observe plaintiffs’ car until they had almost arrived at the bridge. Some incorrect statements are found in the testimony of each one of these witnesses but this, in our opinion, is without importance and merely re- *50 fleets a common tendency. Mrs. Rhea testified to the existence of a marked center line in the road, whereas it is evident from photographs and testimony of Lt. Braley the road was never so marked. Lonnie Williams testified that he frequently took Ellen Nelson with him on his trips to haul pulpwood and Ellen Nelson denies this.
The judgment of the district court is not accompanied with written reasons for the decision which found Lonnie Williams negligent and that he had departed from the scope of his employment at the time of the accident. We are not informed, therefore, as to what acts of negligence prompted the court in its rulings.
We can assume, of course, the two vehicles would not have collided except for one or both being out of the proper traffic lane. Due to extremely bad weather conditions the credibility of all witnesses is affected to some extent as to the estimation of distances and speed. The ability of any of these witnesses to observe carefully was further obscured by darkness. We, therefore, do not attach much weight to the estimate of speed as testified to by the occupants of both vehicles. The road was reasonably straight for approximately a distance of 1,000 feet measured from the top of the hill approximately 650 feet east of the bridge and the apex of the sharp curve approximately 350 feet west of the bridge. We infer from these facts that it was possible for the occupants of the Rhea automobile upon reaching the apex of the curve proceeding easterly to see in that direction a car approaching within 1,000 feet. Mrs. Rhea testified that she first observed the truck approaching when it was at the top of the hill east of the bridge. The testimony of Lonnie Williams, Charlie Grimit and Ellen Nelson does not enable us to say or discern the distance between the two vehicles when the occupants of the truck first observed the approach of the Rhea automobile. Their testimony indicates the Rhea automobile was not observed until it was very close to the truck. Thus, Lonnie Williams testified:
“When I got whe.re I could see the bridge, me and him was on the bridge.”
Charlie Grimit testified that he could not see very far but he could see better than Lonnie.
Grimit, it is to be noted, testified the lights of the Rhea car were not turned on. If we assume this witness did not observe the approaching headlights, the conclusion is inescapable that under the prevailing conditions he could not have observed the Rhea automobile for any considerable distance prior to the collision. Ellen Nelson did not testify as to the distance of the other vehicle when she first observed it. The testimony of these three witnesses impresses us that they were not alert and observant or they should have observed the headlights of the approaching automobile sooner. Charlie Grimit, it is noted, was the only witness to testify the headlights of the Plymouth automobile were riot turned on.
We are of the opinion that the only reliable evidence as to the observation of either approaching car is the testimony of Mrs. Rhea that when she first observed the truck it was approaching and on the top of the hill east of the bridge. Despite repeated questions this witness declined to estimate or definitely fix the location of the Rhea car when she first observed the approaching truck. If this witness was alert, and it would seem that she was, the Rhea automobile was about at the apex of the curve when Mrs. Rhea first observed the approach of the truck. This deduction leads to the further inference that if the Rhea automobile was in the apex of the curve approximately 400 feet from the locus of the impact, and the truck was approximately 600 feet therefrom, the truck was traveling at a much greater rate of speed than that of the automobile. Thus, if the automobile was traveling at a speed of thirty miles per hour, the truck was traveling at a speed of approximately forty-five miles per hour. Noted also as a possible factor in considering the speed of the two vehicles is the fact the truck had to come down the hill to enter a straight stretch of more or less level road for a distance of approximately 600 feet from the top of the hill to the place of the collision. ■ This would enable the truck to acquire some acceleration. On the other hand, *51 the automobile had to go around a sharp curve before straightening out and approaching the locus of the accident about 400 feet away. We are inclined to believe that a motorist, especially under such weather conditions, would slow his vehicle upon rounding such a curve. These inferences have persuaded us the truck was traveling at a greater rate of speed than the automobile.
Counsel for respondents point to the testimony of Lt. Bert G. Braley as concluding in his report the Rhea automobile was traveling at a speed of fifty miles per hour. Braley reached this conclusion solely from an appraisement of the physical damage sustained by the two vehicles. He arrived at the scene of the accident some time after it occurred and after Mr. and Mrs. Rhea had been removed to the hospital. In the absence of other evidence his conclusion is unwarranted. We cannot, therefore, accept such evidence and prefer to rely upon our opinion as to the speed of the two automobiles. Lt. Braley, after his examination of the scene of the collision, reported the point of impact occurred on the south lane or in the traffic lane being traveled by the Rhea automobile. His testimony and photographs of the scene show the automobile came to rest far over on the south side of the highway, whereas the truck was almost directly across the highway with its front and extending over onto the south side of the pavement. He also indicated that the point of impact occurred a short distance to the east of the positions, at rest, of the vehicles. We believe that Lt. Braley was more competent to determine the point of impact than he was to judge the rate of speed traveled by either of the two vehicles. We think his opinion that the truck struck the automobile on the south side of the pavement corroborates the testimony of Mrs. Rhea that the truck was beyond the center of the highway. Another fact which seems to confirm a finding that the truck was over the center of the road is found in the testimony of Charlie Grimit who said that when the brakes were applied he told Lonnie: “Whup ! Dare come dat man! I say ‘Better hold ’er’ and by that time he just got on his brakes by hit bein’ rainin’ and slick, the truck just switched on around and that jammed it; of course, it was better for him to stop that for it to happen on the bridge or we’s all be dead.” Lonnie Williams also testified on cross examination prior to trial that at the time of the collision Mr. Rhea was on his side of the road. A11 of these circumstances confirm the fact that the Rhea automobile was traveling in its proper lane of traffic when the collision occurred.
Following the accident Lonnie Williams was arrested and plead guilty in the district court for Webster Parish to a charge of negligent injury to Mrs. Rhea, thereby confessing he was driving the truck in a reckless and careless manner when the collision occurred.
Defendants have not seriously urged the plea of contributory negligence before this court. We do not find either Rhea or his wife were negligent but that the sole cause of the unfortunate accident was the negligence of Lonnie Williams. We find no merit in the alternative plea of contributory negligence. Nor do the facts here presented permit of the application of the last clear chance doctrine. It is not shown that Rhea had any opportunity to avoid the accident.
Because of our findings as above set forth we conclude, as did the district judge, that the proximate cause of the accident was the negligence of the driver, Lonnie Williams. The acts of the driver justifying our holding are: a failure to maintain a proper and alert lookout, excessive speed under the prevailing weather conditions, and a failure to have his vehicle under proper control.
The demands against Allen and Alfred Farrington were rejected by the court a quo, it being held that these defendants could not be cast under Article 2320 of the LSA-Civil Code. Under this article responsibility of the master for damages occasioned by his servant only attaches when the servant is engaged in the exercise of the functions for which he is employed.
.The testimony in the instant case reveals that on the morning of the accident Lonnie Williams drove the truck from the Farring- *52 ton farm where he lived and where the truck was kept, along the Plain Dealing-Spring-hill Road, through Springhill, and thence south on the Springhill-Minden highway to Cullen; thence east along what is known as the Cullen-Froggy Bottom Cut-Off Road through Froggy Bottom where he picked up his helper, Charlie Grimit. He also picked up Ellen Nelson. Parenthetically, we may state, Williams testified he frequently took Ellen Nelson along with him when he was hauling pulpwood. From Froggy Bottom Williams proceeded on the Cullen-Froggy Bottom Cut-Off Road to a point where the Cut-Off Road and the Springhill-Shongaloo Highway intersect. From this point he turned to the right and proceeded in an easterly direction along the Springhill-Shonga-loo Road to the wood loading point. Customarily, Williams, after loading his truck with pulpwood, proceeded in a westerly direction along the Springhill-Shongaloo Road to where it intersects the Cullen-Froggy Bottom Road, known as the Tapscott Road, and proceed thence through Froggy Bottom to the mill site at Cullen where the truck is unloaded. After the last load of pulpwood is delivered to the mill, Williams would then proceed from the mill in Cullen to the home ■of Charlie Grimit and from there to the Farrington place by traveling west from Charlie Grimit’s home in Froggy Bottom to where the road intersects the Minden-Springhill Highway, thence northerly to the Town of Springhill, thence westerly on the Plain Dealing-Springhill Road to the Far-rington place. Williams’ employers testified he was instructed to go the most direct way in going to and from the place where pulpwood was loaded. Under these instructions there was no occasion.for Williams to use the Springhill-Shongaloo Highway at the point where this collision occurred. Rather, it was the duty of Williams in proceeding from the pulpwood loading place, either to Cullen or to the Farrington home, to return by the Tapscott Road thence through Froggy Bottom, Cullen and Springhill. The accident occurred at a point one-half mile west of the intersection of the Tapscott Road and the Springhill-Shongaloo Highway. The testimony of Williams and Grimit is that the truck was returning empty from the loading place because the truck had run out of gasoline and it was too late to take a load to the mill. As Williams and his companion were returning to the Farrington farm, and on the way there to drop off Charlie Grimit at his home in Froggy Bottom, Williams decided they would go directly to Springhill to a motion picture show. Following this decision the truck passed the Tapscott Road intersection where he should have turned to go to Froggy Bottom for the purpose of returning Charlie Grimit to his home, or to proceed to the mill site at Cullen, or to proceed by the nearest route to the place where the truck was kept. Irrespective of which route the truck took it would have to pass through Springhill in order to arrive at the Farrington farm. By way of the Tapscott Road was perhaps a half mile shorter.
The testimony of Williams and Grimit that they were actually going to a picture show when the accident occurred is questioned by counsel for plaintiffs. However, this testimony is not contradicted and in view of the fact that the truck was not going along the most direct route for the purpose of returning Charlie Grimit to his home, we think the point well established.
It is our opinion that at the time of the accident Lonnie Williams had deviated from the instructions of his master to take the shorter route home and was engaged solely on a personal mission having nc relation to the employment of his master. At the time of the collision he had not returned to a duty connected with his employment. In James v. J. S. Williams & Son, Inc., 1933, 177 La. 1033, 150 So. 9, 11, the responsibility of the master when the servant has turned to a mission entirely personal to the servant, was thus appraised:
“The mere fact that the person to whose negligent and wrongful act the injury and damage is attributable was in the general employment of another person ‘does not necessarily make the latter the master, and responsible for his acts. The master is the person in whose business he is engaged at the time and who has the right to control *53 and direct his conduct.’ Berry on Automobiles (6th Ed.) Vol. 2, § 1315; Atkins v. Points, 148 La. 958, 88 So. 231, 232; Tinker v. Hirst, 162 La. 209, 110 So. 324.
“Liability in cases of this kind depends, not upon the fact of ownership of the car and the general employment of the person who drives it and causes the injury, but upon whether the driver was, at the time of the injury, in the exercise of the functions for which he was employed, for it is only while in the exercise of those functions that the relationship of master and servant or principal and agent exists.
“An employee is the agent or servant of his employer only while engaged in doing for his employer something which he has been directed to do or some act which can be reasonably and fairly said to be a natural incident of the employment, or logically and naturally connected therewith. But when an employee turns entirely and wholly aside from the purposes for which he was émployed and engages in some act or enterprise in no way connected with or incidental to his employment, the employer is not responsible for damages caused by the employee while so engaged.”
In Braud v. Vinet, La.App., 1941, 5 So.2d 200, 202, Judge LeBlanc considered the problem with which we are concerned, observing :
“But it is a rule well established by jurisprudence that even though the employee may not have finished the task he was engaged in or may not yet have returned to the base from which the -task began, if during the course of the -performance of the task he deviates -momentarily to go on some mission of 'his own or to do something that is not •connected with his work, and it is during the course of such deviation that -through his fault damage is caused to •someone, he will be held to have been outside of and beyond the course and scope of his employment and his employer is not answerable. It is of course also well established that the rule of deviation is qualified by the further rule of re-entry, which means that when, after having deviated therefrom, the employee resumes the work he was engaged in, he then re-enters the course and scope of his employment and the employer is to be held accordingly. This period of re-entry extends to the return of the employer’s vehicle which the employee uses in his work, to the place where it belongs.
“We had these questions for consideration in the recent case of Warnick v. Louisiana Highway Commission, [La.App.] 4 So.2d 607, in which they were .treated somewhat at length. We there quoted approvingly from an article published in 14 Tulane Law Review page 72, to the effect that in order for it to appear that a re-entry has taken place, three elements must be present: (1) The trip on which the employee is engaged must have had its origin in the employer’s business, (2) The mental purpose of the employee following the deviation must be to return to his next duty whether it be to continue his work or to return the vehicle he is using to the place where it belongs and (3) The purpose to return must have been put into effect by starting his return journey.”
See Williamson v. De Soto Wholesale Grocery Company, Inc., La.App., 1943-1944, 16 So.2d 739; Sun Underwriters Insurance Company v. Standard Accident Insurance Company of Detroit, Michigan, La.App., 1950, 47 So.2d 133.
It is apparent from the facts presented herein that Williams met the first two requirements to effect a re-entry as prescribed by Barret in his article entitled “The Factor of Route in the Doctrine of ReEntry in Louisiana”, 14 Tulane Law Review, 72, but the third requirement, that is *54 the purpose to return the truck to the Far-rington farm had not been put into effect by starting the return of the vehicle to that place. It is true that generally speaking Williams was in effect returning the truck from the pulpwood loading place to the Far-rington farm, but while so doing he and his companions decided to go to a picture show which resulted in a deviation from the customary route and he was in the act of proceeding to the picture show when the accident occurred. There was then no return from the deviation because his personal mission had not yet been accomplished. We, therefore, hold the judgment from which appealed was correct in rejecting plaintiffs’ demands against the owners of the truck.
It is made clear by the record that damages for the injuries received by Archie T. Rhea and Mrs. Katherine Hill Rhea exceed the limits prescribed in the policy issued by the appellant, Travelers Indemnity Company. Mr. Rhea suffered a severe brain concussion with contusions of the right cerebral cortex of the brain, which rendered him unconscious for fourteen days. His head injuries have seriously affected his future activities and there is substantial medical evidence in the record he will not again be able to pursue his previous occupation, that of a derrick man in oil work. Mrs. Rhea likewise suffered serious injuries, including multiple body contusions, a crushed chest, lacerations of her face, lip and neck, and one of her knees. Her lip was split to the extent that it had pulled up over her lower teeth which were protruding through the lip. She lost four of her upper teeth, sustained several broken ribs and will have permanent scars upon her left check, lower lip and left and right knees. We will not attempt to enumerate all of the injuries nor the financial losses which plaintiffs have undoubtedly incurred. Because of the limitation of the policy the award of damages was not excessive and must.be affirmed. The liability of the insurer results from the omnibus clause in the policy.
For the reasons hereinabove stated, the judgment from which appealed is hereby affirmed at appellants’ costs.